DETERMINED IN THE

## FIRST DISTRICT

OF THE

# APPELLATE COURTS OF ILLINOIS

DURING THE YEAR 1912.

The People of the State of Illinois, Defendant in Error, v. Samuel T. Warfield, John M. MacFarland and William N. Cooper, Plaintiffs in Error.

Gen. No. 16,353.

1. CONSPIRACY—*definition.* A conspiracy is the combination of two or more persons by concerted action to accomplish some criminal or unlawful purpose, or some purpose not, in itself, criminal or unlawful, by criminal or unlawful means.

2. CONSPIRACY—*unnecessary that conspirator have pecuniary benefit.* To render a person criminally liable as a conspirator it is not necessary that under the scheme he should have any pecuniary benefit in the matter, or have joined with a view of obtaining pecuniary benefit.

3. CONSPIRACY—*when indictment need not aver intent to defraud.* In an indictment under Criminal Code, § 46, for conspiracy to obtain money by false pretenses, it is doubtful if an averment of an intent to cheat and defraud is essential.

4. CONSPIRACY—*when indictment sufficiently avers intent.* If it is essential that an indictment under the Criminal Code, § 46, for conspiracy to obtain money by false pretenses should aver a fraudulent intent, such intent need not be expressed in the precise words "cheat and defraud;" it is sufficient if such intent is expressed in equivalent words.

5. CONSPIRACY—*averment equivalent to intent to cheat and defraud.* An averment in an indictment that a conspiracy was en-

(1)

tered into with the fraudulent and malicious intent to fraudulently obtain by false pretenses is equivalent to charging an intent to cheat and defraud, where the question is raised only after verdict by a motion in arrest of judgment.

6. CONSPIRACY—*when counts in indictment are not repugnant.* Where an indictment contains two counts charging, respectively, conspiracy in obtaining money by false pretenses and conspiracy by the confidence game, that the means employed to consummate the conspiracy would, if fully executed, constitute either of two separate and distinct offenses does not render one of the counts vulnerable to attack by motion in arrest of judgment.

7. CONSPIRACY—*when election between counts not required.* The prosecution will not be required to elect between two counts charging, respectively, a conspiracy in obtaining money by false pretenses and a conspiracy by the confidence game.

8. CONSPIRACY—*when unnecessary to determine whether obligations to pay money are money.* Book agents wrote a bogus subscription contract and one of them showed it to a patron, representing that it was genuine, and that if the patron would purchase the books from the publishers the agent would resell them at an advanced price to the bogus purchaser. The patron purchased the books and signed and gave an instalment contract, checks and promissory notes. The agents were indicted under the Criminal Code, § 46, for conspiracy in obtaining "funds, money and property" by false pretenses. *Held,* the evidence tended to show the object of the conspiracy was to obtain money by false pretenses and it was unnecessary to determine whether the obligations or the signatures thereto were money.

9. FALSE PRETENSES—*scheme may be a confidence game, though victim receives value.* A scheme to defraud may be a scheme to obtain money or property by means and by use of the confidence game without the scheme contemplating that the person defrauded shall receive nothing of value from the confidence men.

10. CONSPIRACY—*when evidence of prior similar offense is admissible.* Where book agents write a bogus subscription contract and one of them shows it to a patron, representing that it is genuine, and that if the patron will purchase the books from the publishers the agent will resell them to the bogus purchaser at an advanced price, and the patron purchases the books, executing a contract, and the agents are tried for conspiracy in obtaining money by false pretenses and by the confidence game, evidence of facts known to a conspirator relating to the procuring of prior contracts from the patron by others, by relatively similar methods, is admissible when limited to showing that the facts were of a character calculated to influence the conspirator to initiate or participate in the conspiracy alleged in the indictment.

11. CONSPIRACY—*when absence of possessor of original document may be proved.* Where a book agent is tried for conspiracy in obtaining money from a patron by false pretenses and by the confidence game, in proving facts known to the conspirator relating to the procuring of prior contracts from the patron by others, by relatively similar methods, evidence of witnesses that a person in possession of a prior original contract was without the state and that a fruitless endeavor had been made to serve a subpoena on him is admissible when limited to the purpose of laying a foundation ·for secondary evidence of the contract.

12. CONSPIRACY—*when the asking of insinuating questions is not prejudicial.* Where a book agent is tried for conspiracy in obtaining money from a patron by false pretenses and by the confidence game, permitting the asking of defendant and his witnesses, whether the profit in the de luxe book business did not lie in dealing with suckers, whether an agent had not procured a contract when a customer was drunk, whether a witness had not cautioned another about joining the "Flat iron gang," and whether the defendant had not been engaged in a prior fraudulent deal, is not prejudicial error where objections to such of such questions as were irrelevant were sustained.

13. CONSPIRACY—*when evidence of use of another name is admissible.* Where a book agent, on trial for conspiracy in obtaining money from a patron by false pretenses and by the confidence game, testifies without objection on cross-examination that he had never gone by another name, further cross-examination relating to his use of such name is admissible as affecting his credibility.

14. WITNESSES—*cross-examination.* It cannot be maintained that cross-examination of a witness for the prosecution was improperly restricted in that answers to certain questions would have disclosed the relations of the witness' husband to the prosecution, where there was no such suggestion in the court below.

15. CONSPIRACY—*evidence sufficient to corroborate confession.* Where book agents are charged with conspiracy in obtaining money from a patron by false pretenses and by the confidence game and one of them turns state's evidence and testifies he fraudulently secured a book contract by representations as to a bogus order that was prepared by the co-conspirator, testimony of a stenographer, giving the substance but not all the details of the bogus order and that the co-conspirator dictated the bogus order to her and that she saw him with pen holder in his hand but did not see him sign it, is sufficient corroboration to support a conviction.

16. CONSPIRACY—*when evidence is ·sufficient to sustain conviction.* On a prosecution of book agents for conspiracy in obtaining money from a patron by false pretenses and by the confidence

game, one conspirator turned state's evidence and testified he sold the books on the fraudulent representation that he would resell them at an advanced price to a bogus person who had purchased them, and that the bogus order was prepared by the co-conspirator. His evidence was corroborated by a stenographer to whom the co-conspirator had dictated the bogus order and there was evidence of acts and statements that the co-conspirator was a party to or had knowledge of the conspiracy. The testimony was all denied by the co-conspirator, who testified he dictated only an option and that he was assured that the sale was honestly conducted. *Held*, a conviction should be sustained.

17. CONSPIRACY—*when conspirator cannot complain of refusal to direct verdict for co-conspirator*. A conspirator cannot complain of the refusal to direct a verdict for a co-conspirator, who was acquitted, on the ground that his retention in the case operated to discredit his testimony when called as a witness for the conspirator, where there was sufficient evidence to warrant submitting the question of the co-conspirator's guilt to the jury.

18. CONSPIRACY—*when instructions not erroneous in not being limited to specific offense*. A book agent, charged with conspiracy to defraud a patron, cannot complain that an instruction containing a correct abstract definition of a criminal conspiracy and instructions containing correct statement of rules for determining criminal liability from circumstantial evidence referring to the indictment, alleged to charge a general conspiracy, are improper in not being limited to the specific offense, when he requested no instruction informing the jury of the precise conspiracy for which he was on trial and assumed and acted upon the theory that the allegations in the indictment were sufficiently specific as to the particular offense.

19. CONSPIRACY—*when error in instructions cured by procuring similar instructions*. A defendant charged with criminal conspiracy cannot complain that correct instructions are improper in not being limited to the particular offense when he has procured the court to give like instructions at his request.

20. CONSPIRACY—*when instruction as to pecuniary benefit is harmless*. An instruction that a person may be criminally liable as a conspirator without having any pecuniary benefit in the matter is not harmful when there is evidence that a conspirator participated in the conspiracy with the view of obtaining pecuniary benefit.

21. CONSPIRACY—*when incorrect instruction as to what constitutes obtaining money is not prejudicial*. Where book agents sell books to a patron by a fraudulent scheme and representations and secure a signed contract and are indicted for conspiracy in obtaining money by false pretenses, an incorrect instruction that the obtaining of a signature of a person to a written instrument con-

stituted the obtaining of funds, money and property within the false pretense statute is not prejudicial, where the jury could not believe the defendant was guilty of a conspiracy in obtaining the signature without necessarily finding he was guilty of conspiracy as charged in the indictment.

22. CRIMINAL LAW—*when inaccurate use of word is cured by entire instruction.*  In an instruction stating that every one accused of crime is presumed to be innocent unless the contrary is proved true beyond a reasonable doubt, etc., the inaccurate use of the word "unless" instead of "until" will not wrongfully inform the jury as to the application of the presumption of innocence, when the jury would not have understood from the language of the entire instruction that it limited the application of the presumption to a narrower scope than authorized by law.

23. CRIMINAL LAW—*when correct instructions may be refused.*  Correct instructions offered by a defendant may be refused where they are covered by instructions offered by either the prosecution or the defense.

24. CONSPIRACY—*when instruction on form of verdict authorizes fixing term of imprisonment in the penitentiary.*  An instruction in conspiracy in obtaining money by false pretenses and by a confidence game as to the form of the verdict directing the jury, in the alternative, to fix the punishment in the penitentiary for a term not exceeding five years and a fine not exceeding $2,000, or at imprisonment in the penitentiary alone, for such term, or at a fine alone not exceeding $2,000, is proper.

25. CONSPIRACY—*when verdict not insufficient for uncertainty and repugnancy.*  Where an indictment contains two counts charging, respectively, conspiracy in obtaining money by false pretenses and conspiracy by the confidence game, a verdict finding the accused guilty of conspiracy in manner and form as charged in the indictment is not insufficient for uncertainty and repugnancy.

26. CONSPIRACY—*when sentence must correspond with verdict.*  Where a jury convicts a person of conspiracy and fixes the punishment at imprisonment in the penitentiary for three years, a judgment sentencing the person to the penitentiary for an indeterminate period under the parole law is unauthorized.

27. CONSPIRACY—*when error in judgment will not cause remandment for new trial.*  Where a jury convicts a person of conspiracy and fixes the punishment at imprisonment in the penitentiary for three years, and the court unauthorizedly sentences the person to the penitentiary for an indeterminate period under the parol law, the verdict being legal and no reversible error intervening prior to the judgment, the case will not be remanded for a new trial and will be remanded for resentence only.

Error to the Criminal Court of Cook county; the Hon. WILLIAM H. McSURELY, Judge, presiding. Heard in the Branch Appellate Court at the March term, 1910. Reversed and remanded with directions. Opinion filed August 12, 1912.

WILLIAM S. FORREST and B. C. BACHRACH, for plaintiff in error, SAMUEL T. WARFIELD.

JOHN E. W. WAYMAN, GEORGE M. POPHAM and ZACH HOFHEIMER, for defendant in error.

MR. JUSTICE BAUME delivered the opinion of the court.

This is a writ of error prosecuted by Samuel T. Warfield to review the record of a proceeding in the Criminal Court of Cook county, wherein the plaintiff in error, together with John M. MacFarland and William N. Cooper, were indicted for conspiracy, etc., and wherein plaintiff in error was convicted by a jury and sentenced to imprisonment in the penitentiary under the Parole law and to pay a fine of $2,000 and the costs of prosecution.

The indictment contains four counts. The first count charges that plaintiff in error and his co-defendants on April 30, 1908, "unlawfully, wilfully and feloniously, with the fraudulent and malicious intent to wrongfully and wickedly obtain money from one Amanda L. Patten by means of false pretenses, did conspire, combine, confederate and agree together, with each other and with divers other persons, whose names are to the jury unknown, to then and there unlawfully and fraudulently obtain from the said Amanda L. Patten a large amount of funds, money and property, to-wit, funds, money and property of the value of twenty-two thousand and seven hundred and ten dollars, the property of the said Amanda L. Patten, by means of false pretenses," concluding against the statute.

The second count charges that said persons on the

same day "unlawfully, wilfully and feloniously, with the fraudulent and malicious intent to wrongfully and wickedly commit a certain felony, to-wit, to obtain money from one Amanda L. Patten, by means and by use of the confidence game, did then and there conspire, combine, confederate and agree together, with each other and with divers other persons, whose names are to the jury unknown, to then and there unlawfully and feloniously obtain from the said Amanda L. Patten a large amount of funds, money and property, to-wit, funds, money and property of the value and to the amount of twenty-two thousand and seven hundred and ten dollars, the property of the said Amanda L. Patten, by means and use of the confidence game," concluding against the statute.

The third count charges that the same persons on the same day "unlawfully, fraudulently and feloniously did obtain from Amanda L. Patten a large amount of funds, money and property, to-wit, funds, money and property of the value of twenty-two thousand seven hundred and ten dollars, the property of the said Amanda L. Patten, by means and by use of the confidence game," concluding against the statute.

The fourth count charges that the same persons on the same day unlawfully, fraudulently and feloniously did obtain from said Amanda L. Patten two certain checks of the aggregate value of $410 to Amanda L. Patten, the owner thereof, and twenty-two certain promissory notes of the aggregate value of $23,200 to said Amanda L. Patten, the owner thereof, "the personal property of the said Amanda L. Patten by means and by use of the confidence game," concluding against the statute.

The defendant MacFarland was not prosecuted, but appeared and testified as the principal witness for the People. At the close of all the evidence the 3rd and 4th counts of the indictment were withdrawn from the consideration of the jury and counsel for the Peo-

ple elected to proceed under the 1st and 2nd counts. Thereupon, counsel for plaintiff in error and for Cooper moved the court to require the People to elect between the 1st and 2nd counts, which motion was denied by the court. Separate motions were then interposed by each of said defendants for peremptory instructions to find said defendants not guilty, which motions were denied and the peremptory instructions tendered therewith were refused. By their verdict the jury found the defendant, Cooper, not guilty, and found plaintiff in error guilty of conspiracy in manner and form as charged in the indictment and fixed his punishment at imprisonment in the penitentiary for a term of three years, and at a fine of $2,000. The court disregarded so much of the verdict of the jury as fixed the term of imprisonment of plaintiff in error at three years in the penitentiary, and, as heretofore stated, sentenced plaintiff in error to imprisonment in the penitentiary under the Parole law and to pay a fine of $2,000 and costs of prosecution.

A recital in the first instance of the facts which the evidence offered by the People and admitted by the court tended to prove, will conduce to a better understanding of the issues involved and of the questions raised upon the record.

At and prior to the time of the transaction in question plaintiff in error, MacFarland, and Cooper were book agents engaged in selling de luxe editions of books to customers throughout the United States, and the prosecuting witness, Amanda L. Patten, hereafter referred to as Mrs. Patten, was a reputed wealthy resident of Evanston, Illinois. Prior to the summer or fall of 1907 MacFarland on different occasions had sold to Mrs. Patten books in ordinary binding at about $3.00 per volume, the aggregate of such sales amounting to $500 or $600. Thereafter, in September, 1907, MacFarland had a conference at the Auditorium Annex Hotel in Chicago with Albert Adams and Samuel Rosenfield, two other book agents, regarding the pros-

pects for business generally, at which conference the probability of selling books to prospective purchasers, including Mrs. Patten, was discussed. Adams then informed MacFarland that Rosenfield had sold Mrs. Patten books at from $25 to $40 per volume, and that she was being educated to buy more expensive books than MacFarland had sold her. Rosenfield then corroborated Adams' statement and told MacFarland that Mrs. Patten was easily handled, and that as she was a customer of his he could make a lot of money for all of them, if he would follow the course and adopt the plan outlined by Rosenfield, as follows: "Go out and tell her that you have a party that will buy some books; that you have a contract from somebody at some place out of town, either in Europe or on the way home, so that you cannot get at them now; that if she will give you an order for those books, or practically loan you her credit, you will resell them to this particular party on his arrival in this country, or when you can get at him, at a price about three times the price she is to pay, and that the profit will be divided between yourself and Mrs. Patten." Shortly following this conference, MacFarland, accompanied by Phinnius Drew, another book agent, called on Mrs. Patten at her residence and further secured her confidence and sympathy by representing himself as a graduate of Harvard who was in destitute circumstances and desirous of an opportunity to start in business for himself. He then said to Mrs. Patten that he had an opportunity to make some money if she would assist him by lending him the credit of her name; that he had an order from a Mr. Ladd, a banker in Portland, Oregon, for two sets of books—the British Poets and Scott's Works; that Mr. Ladd was in Japan or on the ocean on his way back, and for that reason he could not deliver the books to Mr. Ladd and obtain the money therefor; that he had an option on the books from a Mr. Newbegin, a book dealer in New York City,

which option would expire in a few days, and unless he secured the books on that option somebody else would get them and sell them to Mr. Ladd or to some other person, and make a great deal of money; that if she, Mrs. Patten, would sign a contract to buy the books for $5,200, he would get the books from Newbegin and hold them until Mr. Ladd returned to Portland; that he would not enforce the contract against her, but merely wished her to lend him the credit of her name; that he would make the first payment on the contract due December 4, 1907, and that she would probably not be required to make any payment on the contract at all, certainly not more than one or two payments; that Mr. Ladd would return to Portland before December 4, and when he returned he, MacFarland, would take the books off her hands and deliver them to Mr. Ladd at a price much in excess of $5,200, and would divide the profits with her. Mrs. Patten then told MacFarland she did not desire to participate in any of the profits, but merely wanted MacFarland to sign an agreement to take the books off her hands in case Mr. Ladd did not take them. MacFarland signed such an agreement, and thereupon Mrs. Patten signed a contract to purchase said books from Newbegin for $5,200, payable in monthly installments of $260. While Mrs. Patten had some acquaintance with, or knew of a Mr. Ladd, a banker in Portland, MacFarland did not know him, and had no order from him for any books. The contract signed by Mrs. Patten for the purchase of said books was delivered by MacFarland to his partner, F. A. Praeger. On November 11 following, Rosenfield took said contract to Mrs. Patten and told her that the books were in the warehouse ready to be delivered through the Irving Squire Company, book publishers and sellers in Chicago, and requested her to make the first payment of $260 on the contract, which she then did by delivering to Rosenfield her check for that amount, payable to the Irving

Squire Company. Later on the same day Rosenfield again went to the residence of Mrs. Patten and told her that he had just met a Mr. Adams, who had returned from Racine, and asked her whether she would have any objection if the contract for the British Poets and Scott's Works, was changed so that it would appear to come through Adams. Mrs. Patten replied that it made no difference to her through whom the contract came, and Rosenfield then returned to her her check for $260, and in lieu thereof she gave him a check for $300, made payable to Adams. This check was paid at the bank and charged to Mrs. Patten's account. On November 22nd following, MacFarland went to the residence of Mrs. Patten, when she informed him that she had been told by Rosenfield that the British Poets and Scott's Works were ready for delivery, and that she had made the first payment on the contract to Rosenfield, because she did not want to do anything that would injure his, MacFarland's, chance to make a sale. MacFarland then told her that he was going to Portland to deliver the books to Mr. Ladd, but that he was short of money and requested a loan from her for his traveling expenses. Thereupon, she gave him a check for $150, which he cashed at the bank and which was charged to her account. On December 3rd following, MacFarland again saw Mrs. Patten and told her that Ladd would not take the books, because of the prevailing financial panic. Mrs. Patten then told MacFarland that the situation was most embarrassing and annoying to her, because she had ordered books she did not want, merely to accommodate and help him. MacFarland expressed his regret at her discomforture and suggested that he could change the books for a set of Hallowell-Shakespeare, which was a very choice limited edition that he could sell to a party in New York City at an advance of at least $6,000; that he knew of a similar set of Hallowell-Shakespeare which had been sold for $12,000, and

showed her a newspaper clipping which so stated. MacFarland then persuaded Mrs. Patten to sign a contract with Adams, whereby she agreed to pay Adams $8,800 in monthly installments of $450 for a set of the Hallowell-Shakespeare, and she then gave to MacFarland her check for $450 to apply on said contract, which check was cashed at the bank and charged to her account. It was then also understood between Mrs. Patten and MacFarland that the check for $300 which she had previously given to Rosenfield should be applied on the Hallowell-Shakespeare contract. The 38 volumes constituting the set of Hallowell-Shakespeare were delivered to Mrs. Patten on December 4 and stored in the basement of her residence. After Adams acquired the contract for the British Poets and Scott's Works, he called upon Mrs. Patten for the purpose of securing her verification of said contract, and again called upon her after she had executed the contract for the Hallowell-Shakespeare, and credited the two items of $300 and $450 on said contract. Later in December, 1907, Adams again called on Mrs. Patten and told her that he had been informed by MacFarland that she would make a very considerable payment on the Hallowell-Shakespeare contract in January following. Mrs. Patten then informed Adams that she did not want the books; that she had executed the contract merely for the purpose of accommodating and helping MacFarland; that the books had never been opened and were in the same condition in which they were received. Adams expressed his surprise that anybody should do such a thing and informed Mrs. Patten that the contract was iron-bound and that she could not get away from it. On December 23, 1907, MacFarland called on Mrs. Patten and obtained $85 from her for the ostensible purpose of paying his expenses to New York City, where, he represented to her, he could sell the set of Hallowell-Shakespeare at a profit of at least $600. Thereafter, Mrs. Patten gave

to Adams her checks to be applied on the Hallowell-Shakespeare contract, as follows:  January 7, 1908, $250; January 23, 1908, $500; February 7, 1908, $600; March 4, 1908, $500.

In January or February, 1908, plaintiff in error and MacFarland became acquainted, and in March following they entered into an arrangement whereby they became partners as book sellers.  Books were sold to purchasers under contracts, which contracts were transferred to publishing houses from which plaintiff in error and MacFarland received a commission of from 25 to 30 per cent.  Shortly after the partnership was formed MacFarland informed plaintiff in error that Mrs. Patten had been a customer of his, and further informed plaintiff in error in detail regarding the various transactions in which she had been concerned, as heretofore recited, and that she was much disturbed with reference to the status of the Hallowell-Shakespeare contract, and her inability, or the inability of MacFarland, to dispose of the books, or to recover the money she had paid upon the contract.  On April 29, 1908, at the Auditorium Annex Hotel in Chicago, plaintiff in error disclosed to MacFarland a scheme whereby Mrs. Patten might be induced by MacFarland to enter into a much larger contract for the purchase of books, with a view to realizing sufficient profits from the transaction to enable her to liquidate her obligation to Adams upon the Hallowell-Shakespeare contract.  The scheme thus proposed by plaintiff in error was, in substance, that plaintiff in error would draft an order or contract addressed to MacFarland, and purporting to be signed by a Mr. Emerson of Baltimore, a wealthy manufacturer of bromo seltzer, and a purchaser of most expensive books, whereby he should purport to have obligated himself to purchase from MacFarland certain sets of books for $40,000 or $50,000, which contract or order MacFarland should exhibit to Mrs. Patten to induce her to execute a con-

tract of purchase for the same books for $23,000. On the following day plaintiff in error, in the presence of MacFarland, dictated to a public typewriter in the Auditorium Annex Hotel a purported order or contract from Mr. Emerson as thus proposed, and gave the same to MacFarland. The purported Emerson order or contract was destroyed by MacFarland shortly after it was exhibited to Mrs. Patten and was, therefore, not produced in evidence, but as drafted by plaintiff in error it read substantially as follows:

"Baltimore, Maryland, April 26, 1908.
My Dear Mr. MacFarland,
        Auditorium Annex,
                Chicago, Ill.
I subscribe for the following sets of books—(here followed a detailed description of four sets of books including Dickens, Scott and Balzac, together with the number of volumes in each set and the aggregate price therefor, stated as $40,000 or $50,000.)  I suggest you deliver the books within the next ten days, as I want a very quick delivery and I will pay a good part of the money on delivery of the books and the balance within 30 days.
                Yours truly,
                ——————— Emerson."

This order purported to be signed by Mr. Emerson, but the witnesses were unable to remember the initials or Christian name which preceded the surname. On the same day MacFarland, accompanied by plaintiff in error, went to Evanston for the purpose of securing a contract from Mrs. Patten for the purchase of the books designated in the so-called Emerson order. After some discussion it was decided that plaintiff in error should remain at the railroad station in Evanston, and that MacFarland should alone conduct the negotiations with Mrs. Patten at her residence. MacFarland then told Mrs. Patten that he had recently recovered from an illness and was sorry he had been unable to dispose of the set of Hallowell-Shakespeare;

that he had been fortunate in just receiving by mail a contract or order from Mr. Emerson of Baltimore, Maryland, for four sets of books at a very large figure. MacFarland then exhibited to Mrs. Patten the purported Emerson order, and assured her there was no possible chance of failure to procure its consummation. He further told her that he had an option from the Keller-Farmer Company of New York City, for the books mentioned in the Emerson order for $22,300, and that if she would sign a contract for the purchase of said books at that price and give him an order on the Keller-Farmer Company for the books, he would procure the books, deliver them to Emerson at Baltimore, collect the contract price or as much thereof as possible from Emerson, pay the Keller-Farmer Company the $22,300 and bring the balance to her, so that she might be able to settle in full with Adams for the Hallowell-Shakespeare. Acting upon these representations and in the belief that the Emerson order was genuine Mrs. Patten then executed a partly printed and partly written contract, the written portion of which was filled in by MacFarland. The contract was as follows:

"Contract No.........
KELLER-FARMER COMPANY, Publishers
    220 Fifth Avenue, New York.
I hereby authorize you to purchase and bind for me the following publications:

| Title | Volumes | Binding | | Price |
|---|---|---|---|---|
| Dickens ............... | 60 | Special | | $6000. |
| Scott .................. | 51 | " | " | $5100. |
| Edition) ............. | 52 | " | " | $5200. |
| Thackeray (Smith Elder | | " | " | |
| Balzac ................ | 40 | " | " | $6000. |

$22,300.
Please deliver the same at the address and as nearly as convenient according to the directions given below. I agree to pay for the same $————— at once and $1000 per month on the 30 day of each and every month

hereafter until $22300 full amount of contract shall have been paid.

It is understood and agreed that the right and title of the books herein described shall not rest with me, but that they shall be held by me in trust as the property of Keller-Farmer Co., until the whole amount has been paid in full.

It is further understood that this contract when accepted by the publishers is unconditional and will not be affected by any agreement, verbal or otherwise, or any representations or statements made by the agent, canvasser, or broker who secured this contract unless the same are in writing signed by the publishers or endorsed hereon.

I hereby acknowledge receipt of a copy of this agreement which I understand is not subject to cancellation, and upon the failure on my part to keep any part of this contract, I agree that the entire amount shall become due and payable. The above contract accepted.

Name MRS. JAMES A. PATTEN
Address 1426 Ridge Ave.,
Evanston, Ill.

Received $250.00 cash
Date April 30/08"

MacFarland then also received from Mrs. Patten her check for $60 for the pretended purpose of paying his expenses to New York City to secure the books under his pretended option from the Keller-Farmer Company. After securing the signature of Mrs. Patten to said contract MacFarland rejoined plaintiff in error and exhibited said contract to him, and described in detail the manner in which the same had been procured. Plaintiff in error then said he could not finance a contract for such a large amount and that no publisher would accept such a contract unless it was accompanied by a cash payment of at least $1000. MacFarland replied that it was the best he could do and that Mrs. Patten did not have any ready money just then. Plaintiff in error insisted that he could do nothing unless MacFarland could get notes or make some definite

arrangement. At the suggestion of plaintiff in error, although MacFarland expressed doubt as to his ability to secure her signature thereto, he prepared 22 notes, one for $1,300 and 21 for $1,000 each, payable monthly, and on the following day again went to Evanston, where he interviewed Mrs. Patten at her residence. He then represented to her that it would be absolutely necessary for her to sign said notes as the Keller-Farmer Company would not accept an order for the books merely on her contract therefor, because they knew nothing of her ability to meet the contract; that the Keller-Farmer Company knew nothing of his intention to resell the books, and he preferred, if any inquiry was made by the Keller-Farmer Company in regard to the matter, that she should not inform said company of his intention to sell the books to Emerson; that if she would sign the 22 notes payable to herself, he would immediately take them to New York City, where they would be accepted by the Keller-Farmer Company and he would return to Evanston within 10 days and bring with him enough money to enable her to meet her obligations to Adams on the Hallowell-Shakespeare contract, and in addition thereto would also pay $22,300, being the contract price for the books. Mrs. Patten refused to sign notes made payable to herself, but did then sign said notes made payable to MacFarland, and delivered the same to him upon his express promise that he would not permit said notes to be negotiated. MacFarland then also induced Mrs. Patten to give him her check for $350 for further expense money, upon the understanding that she should be given credit for said amount upon her contract and notes.

On the following day, May 2, 1908, plaintiff in error and MacFarland went to New York City, where they registered at the Hoffmann House on May 3. On that day plaintiff in error communicated with Cooper by telephone at his residence in Flatbush, New York, and

made an engagement with Cooper to meet him at his residence that afternoon with a friend. Pursuant to such engagement plaintiff in error accompanied by MacFarland went to the residence of Cooper, where plaintiff in error informed Cooper that he had a contract for $20,000 worth of business with a customer in Chicago, and also had notes for that amount payable 30 days apart; that MacFarland had gone to Mrs. Patten's house alone and "turned the trick," while he, plaintiff in error, waited at the depot. Cooper then said that if the contract was made payable to the Keller-Farmer Company, it had better be changed and given to Bob Newbegin who had $3,000 or $4,000 he was anxious to use; that Newbegin would buy the business and probably divide his profits with a man named Simons who usually took half of the business and assumed half of the risk; that he thought better terms could be made with Newbegin than with the Keller-Farmer Company. On May 4, presumably at the instance of Cooper, Newbegin called on plaintiff in error and MacFarland at the Hoffman House and was informed by plaintiff in error that he and MacFarland had some business with a party in Evanston amounting to $22,300, and had notes for that amount, payable 30 days apart; that the party was worth at least half a million dollars and that he and MacFarland wanted 30 per cent on the amount of the contract. In response to an inquiry by plaintiff in error whether Newbegin would take the business on the terms stated Newbegin said if plaintiff in error and MacFarland would accept part of the 30 per cent down, a part of it after the delivery of the books, and the last installment of it after the first note was paid, he would sell half of the business to Simons and in that way would eliminate all possibility of plaintiff in error and MacFarland being required to return whatever commission they had received "up to the time of the falling down of the business"; that Simons would receive half of the prof-

its and would be perfectly willing to stand half of the loss. MacFarland then said to plaintiff in error, in the presence of Newbegin, that he had given his word of honor to Mrs. Patten that the notes would not be discounted, whereupon plaintiff in error asked Newbegin, in substance, whether that would be satisfactory, and Newbegin replied that it would. Newbegin then asked MacFarland, in substance, whether he had procured the business himself and whether plaintiff in error was present when it was procured, and MacFarland replied that plaintiff in error did not go to the house, but that he was in Evanston at the time. After a general discussion relating to the financial responsibility of Mrs. Patten, Newbegin said he would meet plaintiff in error and MacFarland that afternoon and pay them $1,000 apiece; that when the books were delivered and receipted for, he would pay them an additional $1,000 apiece, and after the first note was paid he would pay them the balance of the 30%. MacFarland then said he wanted to make the delivery of the books to Mrs. Patten himself, and in answer to Newbegin's inquiry, "Why is that?" MacFarland replied that he had sold the books to Mrs. Patten on the investment scheme; that they must give her to understand there would be a delay of some kind and she would be required to receive the books; that when they arrived in Chicago they would have to make up some new plan for the purpose of fooling Mrs. Patten and securing more time until she should be obliged to pay the first note. At the suggestion of plaintiff in error MacFarland then scratched out the words "Keller-Farmer Company" where they appeared in the contract and in lieu thereof wrote the name "R. G. Newbegin" in ink of the same color and appearance, as that in which the contract was originally written. MacFarland then also endorsed his name on each of the 22 notes and delivered them, together with the contract, to Newbegin. Thereafter, on the same day, Mac-

Farland and Cooper had an interview wherein Cooper suggested the advisability of going to see Mrs. Patten and attempting to sell her some more books, and proposed that he might accompany MacFarland when the latter called on Mrs. Patten for the purpose of delivering the books or arranging for their delivery. MacFarland then told Cooper that the existing contract with Mrs. Patten was an investment scheme, and it would be best for him, MacFarland, to see her and find some excuse for the delay which would be more than 10 days; that he had promised Mrs. Patten to have the money paid by Emerson within 10 days, so that she might make the payments to Adams on the Hallowell-Shakespeare contract; that it would be better for him to go than to allow anybody else to go who did not know the conditions, and "bungle it up." Cooper then suggested that the plan proposed by MacFarland be abandoned, and that upon their arrival in Chicago they adopt some new plausible scheme to make Mrs. Patten think there had been a delay of some kind and enable them to get some new business. Cooper then also suggested that they, together with plaintiff in error, go to Chicago the following Sunday. In the afternoon of the same day, May 4, Newbegin returned to the Hoffman House and paid MacFarland $1,000 in cash and at the request of the plaintiff in error promised to give him a check for $1,000 later on. MacFarland then went to Boston. On Saturday, May 9, plaintiff in error and MacFarland again met at the Hoffman House, where plaintiff in error told MacFarland that they must go to Chicago and prepare to make the delivery of the books to Mrs. Patten, so they could get the $1,000 apiece which would then be due; that Newbegin said the books would be shipped to Chicago in the name of MacFarland, care of the Adams Express Company on Wednesday of the following week. MacFarland then asked plaintiff in error whether he expected Cooper to go to Chicago with them, and whether

he thought Cooper could do any business there, to which inquiry plaintiff in error replied in the affirmative, and further said, in substance, that if any man could do business with Mrs. Patten, Cooper could; that Cooper had a quiet, easy way that would appeal to Mrs. Patten very much; that he did not know how much Cooper could do, but it was worth taking a chance. On Sunday, May 10, MacFarland and Cooper left New York City for Chicago, and were joined by plaintiff in error at Philadelphia. Upon their arrival in Chicago the following day they registered at the Auditorium Annex Hotel, where plaintiff in error and MacFarland were assigned to the same room, and where Cooper's baggage was also taken, awaiting the vacation of an adjoining room. Shortly after their arrival in Chicago Cooper said to MacFarland, "I don't think it would be a good plan for me to telephone or make any attempt to see Mrs. Patten until after you and I have made delivery of the books," and MacFarland replied, "I didn't propose to see her until the books are shipped to me here, and I don't think it would be a good plan for you to see her." Two or three days following May 1st, Mrs. Patten received a telephone communication from Adams, inquiring whether she had seen MacFarland, and stating that he heard MacFarland had been out in Evanston. Mrs. Patten replied that she had seen MacFarland, and Adams then said: "I hear he has some notes of yours which he is showing about the street, and I want to notify you that if there is any lawsuit or anything connected with it I don't want to be in it. My account against you is good and I want to give you notice that if there is any loss going to follow I want to be secured in my claim." Immediately following this conversation with Adams, Mrs. Patten informed her husband in detail of all her transactions with MacFarland, Rosenfield and Adams, and of the several contracts, notes, checks, and cash payments made by her, and thereupon Mr. Patten en-

listed the services of his attorney, Joseph E. Paden, and of one or more detectives in an effort to apprehend MacFarland and his confederates, if any.

In the afternoon of May 12, while MacFarland and Cooper were in their room in the Auditorium Annex, Patten, Paden and a detective were admitted to the room, and Paden, who did not then know MacFarland or Cooper, addressing MacFarland, said, "Is this Mr. MacFarland?" MacFarland replied, "No, he is out in the park," whereupon Paden inquired of Cooper if he was MacFarland, in response to which inquiry Cooper shook his head. Paden then said to MacFarland, "This is Mr. MacFarland's room, isn't it?" MacFarland replied, "Yes." Paden then asked, "When do you expect him in?" and MacFarland replied, "This is Mr. Cooper, over there, he may be able to tell you more about it than I can." Paden then turned to Cooper and said, "Do you know when he will be in?" Cooper replied, "usually about 5 o'clock." Paden said, "I will come back about 5 o'clock," and then left the room accompanied by Patten and the detective. Immediately after the door was closed, MacFarland went into the hall and asked Paden whether he would leave his card. Paden replied, stating his full name, profession and office address, that he desired to see MacFarland personally and would see him at 5 o'clock. MacFarland returned to the room and told Cooper he thought that was Mr. Patten, whereupon Cooper replied: "Well, you had better duck until I find out what this is. You and I will go up to the next floor—I will go out and see where they are, if they have gone down stairs, and you go up to the next floor, to the floor above this, and wait for me and I will come up and tell you when they go down on the elevator." MacFarland went to the floor above where Cooper shortly appeared and reported that the parties had gone down in the elevator, and further said to MacFarland, "If you can find out some way to get out by

another entrance or another passage, you had better sneak and telephone me and I will tell you what it is just as soon as I can find out. I will inquire of them what the trouble is and what they want.'' Before leaving, MacFarland said to Cooper; ''I will call you up in a half hour's time and you let me know what is going on. I will tell you where to meet me.''

MacFarland then went to the first floor of the building on the freight elevator and then through a rear exit to Wabash avenue, and telephoned to Cooper from the Olympic Cafe. Cooper replied, ''You can't say much. I am afraid they are clicking in on the phone.'' MacFarland waited at the Cafe, expecting Cooper to meet him there, but as Cooper did not come he went to the Lexington Hotel, where he attempted to communicate with Cooper by telephone. Failing in this he went to a private residence at Michigan avenue and 35th street. After two attempts at and shortly after 5 o'clock by Patten and Paden to gain access to the room of plaintiff in error and MacFarland, they were informed at about 6 o'clock that someone was in the room, and thereupon they went there immediately and found plaintiff in error and Cooper. Paden inquired of Cooper whether MacFarland had returned yet, to which inquiry plaintiff in error responded in the negative and asked Paden, ''What is your name?'' Paden replied giving his name and said he was very anxious to see Mr. MacFarland; that he was told he would be back there at 5 o'clock. Plaintiff in error said MacFarland had not yet returned and stated that his name was Warfield. Paden inquired when MacFarland was expected to return and plaintiff in error or Cooper responded, ''We are not right sure.'' Plaintiff in error said, ''We are interested in this same transaction, and if you have got any—if you want to talk business you can talk to us right now.'' Cooper then said, ''Yes, we are interested and we can talk business, and you do not need to wait for Mr. MacFarland.'' Paden said

he had nothing he wanted to talk with them about; that he simply wanted to see Mr. MacFarland. Plaintiff in error or Cooper then said MacFarland would not be back before 6 o'clock and plaintiff in error suggested that if Paden desired to leave any message they would try to get it to MacFarland. Paden said he did not want to leave any message for MacFarland, but simply wanted to talk with him. Plaintiff in error then said they would try to have MacFarland there by 6 o'clock, and inquired where they could let Paden know when MacFarland arrived. Paden said they would be in the grillroom of the hotel at dinner. Plaintiff in error said, "All right; we will let you know when he comes in." Patten and Paden then went to the grillroom, where plaintiff in error appeared shortly thereafter and addressing Paden said, "What did you say your name was?" and Paden replied, "Joseph E. Paden; I am a lawyer here in Chicago." Plaintiff in error then addressed Patten, saying, "What is your name?" and the latter replied, "Patten." Plaintiff in error inquired, "James A. Patten of Evanston?" and the latter answered, "Yes." Plaintiff in error then said, "Now, gentlemen, I have come down here to you to say that I am not going to have MacFarland here this evening. I do not propose to have him come down here and be served with any warrant." Paden replied that they had no warrant for MacFarland; that they wanted to talk to him and he could come there safely and talk. Plaintiff in error said, "MacFarland is not coming just the same. Now, gentlemen, I want to say to you that we are interested in that same transaction, and if you want to talk business you can talk with us right now; we are ready to talk." Paden said, "Mr. Warfield, you must be a mind reader; I have not said anything to you about what we wanted to see Mr. MacFarland for at all, and you say you are interested in the same transaction, I do not know where you got the impression, I have not told you." Plaintiff in er-

ror then said, "Oh, well, now, that is all right, I understand what you want and you do not need to tell me." Paden replied, "Well, if you understand what we want, why let it go at that, but I am not telling you and I did not, and I do not want to talk business with you or Mr. Cooper, either one, about anything; I want to see Mr. MacFarland."

After some further conversation in which plaintiff in error insisted that MacFarland would not come, if he was to be served with a warrant, and Paden assured him that they had no warrant for MacFarland, but merely wanted to talk with him, plaintiff in error promised to have MacFarland there about 8 o'clock. About 7 o'clock MacFarland communicated with plaintiff in error at the Auditorium Annex by telephone, and inquired what the trouble was. Plaintiff in error replied that Paden, Patten and the Pinkerton man had called and that he, plaintiff in error, would see them and force them to a settlement. Plaintiff in error then also requested MacFarland to come to the Auditorium Annex that evening at 8 o'clock, and MacFarland replied that he would not come down until he found out just what to expect and what Patten and Paden were going to do. At about 8 o'clock plaintiff in error met Patten and Paden in the corridor of the hotel and told them that MacFarland had been heard from and that they could not see him that night; that he, plaintiff in error, was not going to have MacFarland come there at all. Plaintiff in error then also complained that he was being constantly followed by detectives. Some further conversation was had regarding the use of detectives and concerning the making of an appointment for Patten and Paden to meet MacFarland and plaintiff in error, and the latter finally agreed to have Mac-Farland go to Paden's office at 10 o'clock the following morning. At about 10 o'clock the same evening plaintiff in error met MacFarland in a drug store at Cottage Grove avenue and 39th street and informed him that he had made an engagement to have him go

to Paden's office the following morning at 10 o'clock, and that he, plaintiff in error, thought Patten and Paden had a warrant for MacFarland. MacFarland then told plaintiff in error he would not go to Paden's office, unless plaintiff in error would accompany him and have the contract and notes present at the meeting. Neither plaintiff in error nor MacFarland appeared at Paden's office the following morning. Earlier in the evening plaintiff in error was informed by a page employed in the hotel that a lady desired to see him in the Pompeian room, and in response to this information plaintiff in error met Ella McClelland, who was reputed to be engaged to marry MacFarland. Miss McClelland asked plaintiff in error where MacFarland was, and plaintiff in error replied that he did not know; that he would like to know himself; that there was a little misunderstanding in the Patten case, and Mr. Patten was making trouble about it; that it was nothing much and would blow over in a few days; that Mr. Patten was there and they desired to locate MacFarland. She then inquired why Patten wanted MacFarland any more than he did plaintiff in error, and whether plaintiff in error was not in it just the same as MacFarland was, to which plaintiff in error replied: "Oh, yes, of course, you know the thing was framed up, but it looks bad for MacFarland, because he went out there and got the contract, and I wanted to go in with him, but he would not let me, so I waited at the depot for him."

On the night of May 14th, while plaintiff in error and MacFarland, together with Miss McClelland and "a lady friend" of plaintiff in error, whose name is not disclosed by the record, were taking a carriage drive, plaintiff in error said that Patten had offered a reward of $1,000 for the arrest of MacFarland and had a warrant out for him, and had caused photographs of him to be published throughout the United States, and had said he would get MacFarland if it cost him half a million dollars; that plaintiff in error had been told

that he must not leave Chicago, as there was a detention warrant out for him; that plaintiff in error wanted the thing to die of its own weight and if MacFarland would keep in hiding for a while, Patten would call in the reward and would not prosecute him. After some reference by MacFarland to his promise to Mrs. Patten that the notes would not be discounted and his apprehension that an attempt had been made to discount them, plaintiff in error said to MacFarland that if he would stay out of the way quietly, plaintiff in error would have Cooper go to New York and get the notes, and plaintiff in error would take them and make a settlement with Patten; that it would be a good plan to have someone call on Mr. or Mrs. Patten, and asked Miss McClelland whether she would go to call on Mrs. Patten, and upon procuring her partial consent to do so, requested her to meet him at the office of Irving Squire the following morning. On the following morning plaintiff in error, Miss McClelland, Praeger, and John C. Thorne met in the latter's office, and in the course of the conversation someone suggested that Miss McClelland go to see Patten, whereupon Praeger asked plaintiff in error what inducement Miss McClelland could take to Patten, if she went to him. Plaintiff in error replied: "Tell Mr. Patten that the notes and contract will be returned, if he will agree to let up on MacFarland." Immediately thereafter Miss McClelland had a conversation with Patten and then returned to Thorne's office and reported that Patten had agreed to think it over and would see her at 9 o'clock the next morning. Whereupon, plaintiff in error said: "That sounds as though he was relenting to a certain extent." Thereafter, at her own suggestion, which was acquiesced in by plaintiff in error and Thorne, Miss McClelland called on Mrs. Patten at her residence, but the latter declined to receive or to talk with her. On the following day, Saturday, May 16, Miss McClelland called upon Patten, in compliance with his suggestion made the day previous, and also had a conversation

with Paden at the latter's office. On Monday following she met plaintiff in error and told him that Paden would give her no satisfaction in the case; that she had told Paden that plaintiff in error said the notes and contract would be returned, if he, Paden, would let up on MacFarland; that Paden said he didn't care about the notes and contract, but it would be better if they were returned, and in that event they would see what could be done. Plaintiff in error replied: "Well, if they won't give me any satisfaction, we will fight the thing. They can't get MacFarland without getting me, because I am in it just as much as he is."

On May 12th or 13th, Oscar A. Korpf, the law partner of Paden, saw the notes in question in New York City in the hands of one Wollman, an attorney, and said notes then bore MacFarland's endorsement. On May 22nd John T. Pratt, an attorney retained by Paden and Korpf, was called upon at his office in New York City by plaintiff in error, Cooper and one Yorston. Plaintiff in error then said that he had paid MacFarland $1,150 and taken the notes and contract and sold them to Newbegin for $2,000; that after the trouble came out in the newspapers, and while he was in Chicago, he had received a demand by letter from Newbegin for the return of the $2,000, and that he had returned that amount to Newbegin; that he was willing to surrender the notes and contract which he then had upon the payment to him of one-half of the expenses, aggregating $1,900, to which he had been put. Pratt then told plaintiff in error that he had no authority to negotiate a settlement, but would transmit the statement made by plaintiff in error to Paden & Korpf in Chicago. Plaintiff in error then further said that the contract was a regular book contract, which, when he received it from MacFarland, contained the name of the Keller-Farmer Company, and that he suggested that MacFarland change it to Newbegin; that the books were worth the contract price and he had sold several like sets of books at the same price; that he was going

to Chicago on the following Sunday and would communicate with the attorneys for Mrs. Patten; that he knew of the Shakespeare contract and had heard there had been some trouble about it, but understood that Mrs. Patten had accepted the books and had paid the monthly installments for a while, anyway; that he was bitter against Patten because of the reports which had appeared in the newspapers concerning himself and Cooper, which reports had damaged his character and hurt his credit. The offer of settlement then made by plaintiff in error was conditioned by him upon the waiver by Mrs. Patten of all criminal proceedings against MacFarland, and in answer to Pratt's inquiry for the reason he imposed such condition, plaintiff in error said that MacFarland was a friend of his and he was not going to settle this thing after what had come out in the newspapers, unless all prosecution of MacFarland was dropped.

In the latter part of May, 1908, MacFarland, with the knowledge and co-operation of plaintiff in error fled to Canada, where he was apprehended in September following.

Six of the 22 promissory notes, bearing the indorsement of Mrs. Patten, MacFarland and plaintiff in error, together with other indorsements, were deposited for collection in the City National Bank of Evanston, and payment was refused, and suit was thereafter brought by plaintiff in error upon one of said notes.

It is insisted that the motion in arrest of judgment was improperly overruled, first, because the first count of the indictment contains no averment of an intent to cheat and defraud Mrs. Patten of "the funds, money and property," and, second, because the verdict is insufficient for uncertainty and repugnancy.

The second count of the indictment which charges a conspiracy to obtain money by use of the confidence game is conceded to be sufficient in form and substance.

Section 46 of the Criminal Code, upon which the

first count is based, in so far as the same is pertinent, provides, as follows:

"If any two or more persons conspire or agree together * * * to obtain money or other property by false pretenses, * * * they shall be deemed guilty of a conspiracy; and every such offender, * * * shall be imprisoned in the penitentiary not exceeding five years, or fined $2,000, or both."

The argument upon some of the questions involved is somewhat confused by the apparent failure to note the well established distinction which exists between the offense of conspiracy charged in the indictment and the wholly separate offenses of obtaining money or property by false pretenses and of obtaining money or property by means and by use of the confidence game. While in an indictment charging the consummated offense of obtaining money or property by false pretenses, the averment of an intent on the part of the defendant to cheat and defraud another is essential to constitute a sufficient statement of the offense charged, it may well be doubted whether an averment of such intent is essential in an indictment for conspiracy to commit such offense. In People v. Poindexter, 243 Ill. 68, it was held that a conspiracy to commit a felony is a violation of the statute, regardless of the intent, and no reason exists why the same rule should not apply in a conspiracy to commit a misdemeanor. To obtain money or property by false pretenses is an offense under the statute, and the gist of the offense is embodied in the descriptive words, "false pretenses," as they are employed in said section 46, which words, as so employed, by necessary implication comprehend the element of intent to cheat and defraud. In Chicago, Wilmington and Vermillion Coal Co. v. People, 114 Ill. App. 75, it is said: "If a conspiracy to do an illegal act be set forth in an indictment, the charge is complete without the addition of words alleging a criminal intent in the doing of the act. In stating such an offense the criminal intent appears *prima facie* in

the statement of the act itself. 1 Bish. N. C. Crim. Proc., Sec. 521, pars. 3 and 4." People v. Smith, 239 Ill. 91, also supports this view.

But conceding that an averment of such intent should appear in said count, it is not essential that such intent should be expressed in the precise words "cheat and defraud." It is sufficient if such intent is expressed in equivalent words. The count alleges that the defendant "unlawfully, wilfully and feloniously, with the fraudulent and malicious intent to wrongfully and wickedly obtain money,  *  *  *  by means of false pretenses, did conspire  *  *  *  to unlawfully and fraudulently obtain  *  *  *  funds, money and property  *  *  *  by means of false pretenses," etc. The charge that the conspiracy was entered into with the fraudulent and malicious intent to fraudulently obtain by false pretenses is equivalent to charging an intent to cheat and defraud, where the question is only raised after verdict by a motion in arrest of judgment. In Chicago, Wilmington and Vermilion Coal Co. v. People, 214 Ill. 421, it was held that a charge that the conspiracy was formed unlawfully, fraudulently, maliciously, wrongfully and wickedly, while not in the language of the statute, in effect charged the conspiracy to have been formed with a fraudulent or malicious intent, wrongfully and wickedly to do an illegal act injurious to the public, and was sufficient. Following section 6, Div. XI of the Criminal Code, relating to the form of indictments, what is said in Glover v. People, 204 Ill. 170, is pertinent here:

"If an indictment is so specific that the defendant is notified thereby of the charge which he is to meet and is able to prepare his defense, and evidence of the charge upon which he has been tried is preserved in the record so that he will be protected from a subsequent prosecution for the same offense, and the offense may be easily understood by the jury, and the court may be enabled to pass sentence upon him in case of

conviction, the indictment according to all authorities is sufficient.''

As the sufficiency of the second count is conceded, if the evidence is applicable to that count, the motion in arrest was properly overruled, even if the first count is fatally defective. People v. Smith, *supra*.

It is said that the verdict is insufficient for uncertainty and repugnancy because it is impossible for the same transaction to amount to a conspiracy to obtain funds, money and property by false pretenses and also to a conspiracy to obtain the same funds, money and property from the same person by means and by use of the confidence game; that the offenses of obtaining property by false pretenses and of obtaining it by means and by use of the confidence game are repugnant to and mutually exclusive of each other; that if the same transaction constitutes a violation of the false pretense statute and the confidence game statute, then one of the two statutes is nugatory; that if the same transaction constitutes a violation of both statutes, it follows that the same transaction constitutes a violation of the false pretense statute (a misdemeanor), and also a violation of the confidence game statute (a felony); and it further follows that the same evidence will support an indictment for a conspiracy to obtain money by false pretenses with the intent to cheat and defraud and also an indictment for a conspiracy to obtain the same money by the same means alleged to be by means and by use of the confidence game.

The two counts of the indictment submitted to the jury charged merely the single offense of conspiracy. The fact that the means employed to consummate the offense charged would, if fully executed, constitute either of two separate and distinct offenses does not render one of the counts vulnerable to attack by motion in arrest of judgment. The indictment involved in People v. Poindexter, 243 Ill. 68, contained

two counts, the first charging a conspiracy to obtain money by means of false pretenses and the second charging a conspiracy to obtain a like amount of money by means of the confidence game.

For the same reason the court did not err in refusing to require the prosecution to elect between the first and second counts of the indictment.

The refusal of the court at the close of the evidence for the prosecution to instruct the jury to find the defendant Cooper not guilty is complained of upon the ground, that there was no sufficient evidence tending to show his guilt of the offense charged, and further, because his retention in the case as a defendant operated to discredit his testimony when called as a witness on behalf of plaintiff in error, whereby plaintiff in error was prejudiced. It is intimated by counsel for plaintiff in error that Cooper was named in the indictment for the sole purpose of discrediting his testimony as a witness, but the record fails to disclose anything tending to support such intimation. If plaintiff in error was in a position to object to the action of the court in refusing to instruct the jury to find the defendant Cooper not guilty, the objection would be unavailing because there was sufficient evidence adduced upon the trial to warrant the court in submitting the question of the guilt or innocence of Cooper to the jury for their determination.

It is also insisted that the motions made at the close of the evidence for the prosecution and at the close of all the evidence to find plaintiff in error not guilty under each count of the indictment were improperly overruled, and the grounds of such insistence are, that the evidence failed to show a conspiracy to obtain money by false pretenses, while the false pretenses, if any, were to be, and were used, to obtain the signature of Mrs. Patten to the contract and her certain checks and promissory notes; that the signature to a contract or the contract, checks and promissory notes are not

money within the meaning of section 46; that as to the second count, no scheme to defraud is a scheme to obtain money or property by means of and by use of the confidence game, unless the scheme contemplates that the persons defrauded shall receive nothing of value from the person or persons operating the scheme.

The object of the conspiracy charged in the indictment was to obtain "funds, money and property." In the view we take of the case we deem it unnecessary to consider and determine whether the contract, checks and promissory notes obtained from Mrs. Patten were funds or property within the law. The evidence tending to show the conspiracy charged leaves no doubt but that the object of the conspiracy was to obtain money from Mrs. Patten. The object and purpose of the conspiracy in its inception was to dispose of certain books to her upon the investment scheme for $20,000 or more. That the conspirators actually obtained checks and promissory notes does not affect the question. They are charged not with obtaining certain things of value, but with a conspiracy to obtain funds, money and property by means of false pretenses, and by means and by use of the confidence game. In support of the insistence that no scheme to defraud is a scheme to obtain money or property by means and by use of the confidence game, unless the scheme contemplates that the person defrauded shall receive nothing of value from the person or persons operating the scheme, counsel for plaintiff in error cite no authority and we have been unable to find any. The term "confidence game" has been authoritatively defined as "a swindling operation in which advantage is taken of the confidence reposed by the victim in the swindler." Maxwell v. People, 158 Ill. 248; People v. Depew, 237 Ill. 574; People v. Weil, 243 Ill. 208.

The gravemen of the offense charged in the second count of the indictment is the conspiracy to obtain by means of the confidence game—that, is, a conspiracy

to obtain by means of a swindling operation whereby advantage was to be taken of the confidence reposed by Mrs. Patten in one or more of the conspirators. If the purpose of the conspirators to obtain money or property by means of a swindling operation, whereby advantage was to be taken of the confidence reposed by the victim in the conspirators, is established, we are unable to perceive any reason why the character of the conspiracy should be affected by the fact that the conspirators purposed to give the victim something of value. In the case at bar the evidence tends to show that the alleged conspirators well knew that Mrs. Patten could not be prevailed upon to purchase the books mentioned in the pretended Emerson order, and that any contract which she might be induced to execute upon the faith of the said order would be executed by her for the purpose of enabling her, through the profit on the transaction, to liquidate her indebtedness to Adams, and not for the purpose of, or with a view to acquiring the books.

It is next urged that the court admitted improper evidence at the instance of the prosecution. First, the evidence of each of the transactions had by Drew, Rosenfield, Adams and MacFarland with Mrs. Patten prior to April 30, 1908. MacFarland testified that the facts relating to these several transactions were all known to him, and that he fully communicated the same to plaintiff in error prior to April 30, 1908. The testimony of MacFarland in this particular was competent for the purpose of showing that plaintiff in error, prior to his alleged participation in the conspiracy charged, was fully informed of the methods theretofore employed in dealing with Mrs. Patten, and that he adopted and ratified the same; that he was informed of the influences which were most operative upon her, her situation and disposition with reference to the then existing Hallowell-Shakespeare contract, and her desire to be relieved therefrom. All the con-

siderations mentioned were of a character calculated
to influence plaintiff in error, if he chose so to do, to
initiate or participate in the conspiracy alleged in the
indictment. It is conceded by plaintiff in error that
evidence of the contract between Adams and Mrs. Pat-
ten for the Hallowell-Shakespeare; of the amount of
money paid by her to Adams on said contract; of her
desire to obtain sufficient money with which to pay
Adams the amount remaining due on said contract;
and of the conversations between Mrs. Patten and
Adams after said contract was made, was properly
admitted, and we are of opinion that for the reasons
above stated, the facts relating to the procuring of the
Hallowell-Shakespeare contract and the facts relating
to procuring the contract for the British Poets and
Scott's Works, which contract was so intimately asso-
ciated with the Hallowell-Shakespeare contract as to
constitute practically one transaction, were not im-
properly admitted in evidence. It is apparent from
the record that evidence of such prior transactions
was limited to the purposes heretofore stated, and as
there was no pretense that plaintiff in error had actu-
ally participated in such prior transactions, the jury
could not have been mislead into considering the evi-
dence for any improper purpose. While the evidence
relating to such prior transactions covered a wider
field, and involved more detail than was necessary or
strictly proper, its admission within the limitations
stated did not operate to prejudice plaintiff in error.
Second, the evidence of the witnesses, Josephine Beebe
and James Bell, called by the prosecution to show that
Adams was without the state, and that a fruitless
effort had been made to serve a subpoena upon him.
There is some confusion in the record regarding the
offer of secondary evidence of the contents of the
Hallowell-Shakespeare contract, the original of which
was presumably in the possession of Adams, but the
record sufficiently discloses that the testimony of said

witnesses was offered and admitted for the purpose of laying a foundation for the admission of such secondary evidence. The evidence of said witnesses was expressly limited to the purposes named and plaintiff in error could not have been harmed thereby.

It is urged that plaintiff in error was deprived of a fair and impartial trial by the conduct of counsel for the prosecution, in putting to the defendants and to certain of their witnesses, on cross examination, improper and insulting questions, and it is further urged that plaintiff in error was prejudiced by the action of the trial court in permitting too great latitude in the cross examination of witnesses called by the defendants.

The witness, Squire, having testified on cross examination that he was engaged in the business of selling de luxe and art editions of books to some extent, and that his principal field of profit did not lie in dealing with women, was asked: "Well, does it lie particularly in dealing with suckers?" The objection interposed to the question was sustained by the court.

The witness, Thorne, was asked, in substance, whether he had told MacFarland upon one occasion that a book agent employed by the witness had procured a certain customer to become drunk and sign a book contract, and the witness considered it a great joke. The witness answered that he never made such a statement, and thereafter an objection by counsel for plaintiff in error was sustained by the court, and the court directed the jury to disregard the question. Counsel for the prosecution then stated that he desired to ask a similar line of questions for the purpose of laying the foundation for impeachment of the witness, and as tending to show his interest in the case, or his interest in that class of business. The court then cautioned counsel not to step over the limit prescribed. Thereafter, out of the hearing of the jury, counsel for the prosecution read in the record two other questions

of like import, to which objections were sustained, whereupon counsel said he had other like questions, but would not put them. Objection was also sustained to a question asked the same witness regarding his having cautioned MacFarland about joining the "Flatiron gang." Subsequently, the cross examination of the defendant Cooper disclosed that at one time he had an office in the "Flatiron Building" in New York.

Plaintiff in error was asked on cross examination relative to a certain transaction in Milwaukee in April, 1908, whether or not he had made a certain statement to Rosenfield to the effect that he, plaintiff in error, had "soaked" one Kickhoefer in a book deal, and had suggested to Rosenfield that the latter see Kickhoefer and tell him, that he, Rosenfield, had an order from Emerson for certain books at a price in advance of that for which he could get them, and that he could represent to Kickhoefer that with the latter's assistance the books, which plaintiff in error then had, could be procured. Objection was sustained to the form of the question, whereupon another question was asked plaintiff in error as follows:

"Q. Well, Mr. Warfield, did you, during the early part of April, 1908, have any deal of any kind with MacFarland and Samuel Rosenfield, whereby they were to sell a set of books which you were to supply to a man by the name of Kickhoefer, upon the use of the name of Emerson?"

An objection to this question was overruled by the court, and the question was answered in the negative.

The witness, Plunkett, a book agent, who had had business relations with Cooper, was asked on cross examination whether he had ever made any sales of books with Cooper on the investment plan. An objection to the question was sustained. Cooper was asked on cross examination whether he had heard of the investment plan being worked by various other agents than MacFarland. An objection to the question upon

the ground that it was an attempt to smirch the whole book business by insinuation was overruled, and the witness answered that he had heard of it. After plaintiff in error had testified on cross examination that he considered it a perfectly legitimate transaction to strike out the name Keller-Farmer Company in the contract and insert the name of Newbegin, and that he had done it a hundred times, he was asked whether he did not know that such change, if made with the intention of prejudicing the person who made the contract, constituted forgery. An objection to the question was sustained by the court. Plaintiff in error was also asked whether he had ever told MacFarland about any business transaction that he, plaintiff in error, had with a Mrs. Sorg, and an objection was sustained. Plaintiff in error was also asked whether he had used the name "J. J. Williams" in Chicago during the latter part of April, and upon objection interposed the question was withdrawn.

We see nothing sufficiently reprehensible in the conduct of counsel for the prosecution in the instances above cited, or in the line of examination permitted by the court, to warrant a holding that plaintiff in error was prejudiced thereby.

On cross examination plaintiff in error testified that his name was Samuel T. Warfield, and without objection further testified that he had never gone by any other name and had never gone by the name of "J. J. Williams." He was then asked whether a certain signature shown him was his signature, and upon objection being overruled to the question, answered that it was. He then testified that he wrote his name as "J. J. Williams" on the page of the register of the Plankington House of Milwaukee, dated April 8, 1908, and that he was in Milwaukee at that time. The portion of said register containing the signature "J. J. Williams" was offered in evidence, but on objection was excluded. Plaintiff in error had testified on cross examination

without objection that he had never gone by any other name than Warfield and had never gone by the name of J. J. Williams, and as affecting his credibility, we think his further cross examination, in so far as it related to his use of the name Williams was competent.

It is urged that the court improperly restricted the cross examination of Maxine Fay and Ella McClelland, witnesses called on behalf of the prosecution, but a careful consideration of the record discloses that the court did not abuse its discretion in that regard to the prejudice of the plaintiff in error. It is said that answers to certain questions propounded to Maxine Fay would have disclosed her husband's relations to Patten, Paden and the detective, Repetto, and through said relations the relation of the witness to the same parties. There was no such suggestion in the court below, and there is nothing in the record upon which the existence of any such relations can be predicated.

Instructions given to the jury at the instance of the prosecution are complained of. Instruction I informed the jury that a conspiracy is the combination of two or more persons by concerted action to accomplish some criminal or unlawful purpose; or some purpose not, in itself, criminal or unlawful, by criminal or unlawful means.

By instruction I-b the jury were informed that, if from the acts of the parties, as proven, and from all the facts and circumstances in evidence, they believed, beyond a reasonable doubt, that the defendants did pursue the common object of, etc., as charged in the indictment, and by the same means one performing one part and another another part, so as to accomplish the common design, then the jury would be justified in the conclusion that the defendants were engaged in a conspiracy to effect that object.

Instruction I-d informed the jury that all who take part in a conspiracy, after it is formed, and while it is in execution, and all who, with knowledge of the facts,

concur in the plans originally formed, and aid in exe-
cuting them, are fellow conspirators; that their con-
currence, without proof of an agreement to concur, is
conclusive against them; that they commit the offense
when they become partners to the transactions, or
further the original plan.

It is conceded that instruction I is a correct abstract
definition of a criminal conspiracy, and that instruc-
tions I-b and I-d contain correct statements of rules
for determining criminal liability from circumstantial
evidence, but it is insisted that these instructions were
prejudicial to plaintiff in error, in view of the plead-
ings, evidence and other given instructions, because
they were not limited by anything in themselves, or in
any other given instruction to the charge of conspiracy
for which plaintiff in error and Cooper were on trial,
namely, the conspiracy to obtain money or property
from Mrs. Patten by means of the Emerson order and
the false representations made to her by MacFarland
on April 30 and May 1, 1908; that while instruction I-b
and other instructions for the prosecution refer to the
conspiracy charged in the indictment—that is, to the
conspiracies charged in the first and second counts, the
conspiracies charged in said counts are general con-
spiracies and not limited by any allegations to the spe-
cific conspiracy for which plaintiff in error and Cooper
were on trial, as above stated; that said instructions,
in view of the evidence and of the general charges,
contained in said first and second counts, put plaintiff
in error and Cooper on trial for all the conspiracies
by which contracts and checks were obtained from
Mrs. Patten by means of the frauds perpetrated upon
her in 1907 by MacFarland, Drew, Rosenfield and
Adams, as well as by MacFarland and plaintiff in
error (assuming MacFarland's testimony to be true)
on April 30 and May 1, 1908.

Upon the record as made plaintiff in error is not in
a position to complain of the impropriety of the in-

structions indicated on the grounds above set forth. Plaintiff in error requested no instruction informing the jury of the precise conspiracy for which the defendants were on trial within the scope of the allegations in the first and second counts of the indictment, but evidently assumed and acted upon the theory that the allegations in said counts of the indictment were sufficiently specific to include only the conspiracy to obtain money or property from Mrs. Patten by means of the Emerson order, and the false representations made to her by MacFarland on April 30 and May 1, 1908. By the first, sixth, nineteenth, thirty-second, forty-second, forty-eighth and forty-ninth instructions, given at the instance of the defendants, reference is specifically made to the "crime as charged in the indictment," to "the allegations of the indictment," to the "guilt or innocence of the accused of the offense in manner and form as charged in the indictment," and to the "conspiracy as charged in the indictment." As illustrative of the interpretation placed by the defendants upon the first and second counts of the indictment, as charging the specific conspiracy above mentioned, we cite the forty-second and forty-ninth instructions, given at their request, as follows:

"The court instructs the jury that it is their duty to carefully and dispassionately examine each and every fact or circumstance offered in evidence in order to determine whether each and every one of such facts or circumstances is proved to be necessarily connected with the charge in the indictment; and if, after such careful and dispassionate examination of such facts or circumstances, you have a reasonable doubt as to whether any one or more of such facts or circumstances are necessarily connected with the charge in the indictment, then in reaching your verdict you should not use against the accused whatever facts or circumstances, if any such there are, as are not proved to be necessarily connected with the charge in the indictment."

"The court instructs the jury that, in order to justify a verdict of guilty of conspiracy, as charged in the indictment, against the defendant, Warfield, the two following propositions must each be proved beyond all reasonable doubt:

First—That there was a conspiracy, as charged in the indictment.

Second—That Warfield was a member of such conspiracy."

It is elementary that a party cannot complain of instructions when he has procured the court to give like instructions at his request.

McDonald v. People, 126 Ill. 150, cited by plaintiff in error in support of his contention, that the instructions complained of were prejudicial is not in point. In the McDonald case a bill of particulars was furnished by the State, which was ignored in the instructions given to the jury, and an instruction requested by the defendant specifically excluding from the consideration of the jury certain acts as not being within the conspiracy charged, was refused by the court.

Instruction II informed the jury that to render a person criminally liable as a conspirator, it is not necessary that under the scheme he should have any pecuniary benefit in the matter, or have joined with the view of obtaining pecuniary benefit. Ochs v. People, 124 Ill. 399, involved an alleged conspiracy on the part of certain county commissioners to obtain money from the county by false pretenses, and it was held that the scope of the conspiracy was sufficiently comprehensive to embrace within it a transaction for the benefit of one, or a portion of the conspirators, as well as of the whole. The instruction embodies the text in 8 Cyc. 643, and states substantially a correct rule of law particularly applicable in this case to the defendant Cooper. The instruction could not have harmed plaintiff in error, because if he was a party to a conspiracy to obtain money or property from Mrs. Patten

by means of the spurious Emerson order, there can be no question under the evidence but that he participated in the conspiracy with the view of obtaining pecuniary benefit.

Instruction III informed the jury that whoever, with intent to cheat or defraud another, designedly by color of any false token or writing, or by any false pretense, obtains the signature of any person to any written instrument, or obtains from any person any money, personal property or other valuable thing, is guilty of obtaining funds, money and property by means of false pretenses.

The statement to the jury, by necessary implication in the instruction as framed, that the obtaining of the signature of any person to any written instrument constituted the obtaining of funds, money and property within the meaning of the statute relating to false pretenses was manifestly incorrect. The indictment does not charge a conspiracy to obtain the signature of Mrs. Patten to any written instrument, and a reference to that phase of the statute relating to false pretenses had no proper place in the case. We do not perceive, however, how plaintiff in error could have been prejudiced by the instruction, because under the evidence the jury could not have been led to believe plaintiff in error was guilty of a conspiracy to obtain the signature of Mrs. Patten to a written instrument, without necessarily finding that he was guilty of the conspiracy charged in the indictment.

Instruction IV informed the jury substantially in the language of the statute what constitutes the obtaining of money or property by means of the confidence game as judicially defined, and was not improperly given.

The objection to instruction V is answered by what has heretofore been said regarding instructions I, I-b and I-d.

Instruction VI was not inapplicable to the case and

has been approved in Henry v. People, 198 Ill. 162, and People v. Scarbak, 245 Ill. 435, and case there cited.

The first paragraph of instruction X is as follows:

"Everyone accused of crime is by law presumed to be innocent *unless* the contrary is, by the evidence, proved to be true beyond a reasonable doubt; and this principle should be borne in mind by you and employed during the entire proceedings herein, in connection with the introduction of all the evidence herein and each item thereof and during your deliberations when you have retired to consider your verdict."

It is argued that by the use in the instruction of the word "unless" instead of the word "until," the jury were practically informed that the presumption of innocence was not to be considered by them at all if they believed from the evidence that plaintiff in error was guilty. It must be conceded that the word "until" would have more accurately stated the rule sought to be announced by the instruction, but when the language of the entire paragraph quoted is considered, it will be observed that the jury are directed to bear in mind and employ the principle of the presumption of innocence during the entire proceedings in connection with the introduction of all the evidence, and each item thereof, and during their deliberations, when they shall have retired to consider their verdict. The subsequent paragraphs of the instruction state the rules to be adopted by the jury in considering the evidence, and arriving at a verdict most favorably to the defendants, and when the instruction is considered as a whole, it could not have been understood by the jury as limiting the application of the rule relating to the presumption of innocence within a narrower scope than was authorized by the law.

The defendants tendered sixty-nine instructions to be given to the jury, of which number the court gave twenty-one and refused forty-eight. Refused instruction 4 was disapproved in Little v. People, 157 Ill. 153. Refused instruction 5, in so far as it states a

correct rule of law, was sufficiently covered by instructions 1 and 6, given at the instance of the defendants. Refused instructions 7 and 8 are argumentative, confusing and misleading and were properly refused. The law relating to the doctrine of reasonable doubt was sufficiently covered by the given instructions. Refused instruction 13 improperly emphasizes the consideration to be given the arguments and law presented by counsel for the defendants. All that was proper in refused instructions 14 and 15 was covered by other instructions given to the jury. Refused instructions 29, 31 and 36 were sufficiently covered by instructions XI and XII given at the instance of the prosecution, and by instructions 19 and 35 given at the instance of the defendants. Refused instructions 20, 21 and 23 were directed to the consideration by the jury of the testimony of the witness, MacFarland, and were sufficiently covered by instruction XI, given at the request of the prosecution, and by instruction 19, given at the request of the defendants, and by instruction 18, tendered by the defendants and given as modified. As modified by the court, instruction 18, tendered by the defendants, was a statement of the law much more favorable to them than was authorized. Whether Mac-Farland was engaged to be married to the witness Ella McClelland was not a fact material to any issue in the case, and instruction 34, tendered by the defendants was, therefore, properly refused.

It is insisted that the testimony of MacFarland was wholly fabricated and perjured, and that based upon his testimony the conviction of plaintiff in error should not be permitted to stand. We have no hesitancy in saying that if the conviction of plaintiff in error was shown by the record to be predicated solely upon the testimony of MacFarland, we should be impelled to set aside such conviction, but the record does not so show. It is an uncontroverted fact in the case that the spurious Emerson order was presented to Mrs.

Patten by MacFarland, and it is also uncontroverted that MacFarland represented to Mrs. Patten that said order was genuine, and that Mrs. Patten relied and acted upon such representation. By whomsoever conceived, said spurious order was the basis of the conspiracy charged. MacFarland testified that plaintiff in error conceived the scheme involving such spurious order, and that plaintiff in error dictated the same to Maxine Fay in the Auditorium Annex Hotel; that Maxine Fay transcribed said order on the typewriter at the dictation of plaintiff in error, and that plaintiff in error signed the name of Emerson thereto. Maxine Fay, who, so far as the record discloses, was a credible witness, testified that she had frequently written letters, orders and options concerning the sale of books for plaintiff in error at his dictation; that in the latter part of April, 1908, plaintiff in error in the presence of MacFarland, before dictating the order in question, said to her, "Date this at Baltimore, Maryland, day before yesterday"; that she used a blank sheet of paper and addressed it to "Mr. J. M. MacFarland, Auditorium Annex, Chicago"; that at the dictation of plaintiff in error she wrote: "Dear Sir"—or "Dear Mr. MacFarland"; that as she remembered it the letter started out like this: "I hereby subscribe for so many sets of books—describing the editions, and the volumes were tabulated out—the books were tabulated, the price after each set and then there was the total"; that she remembered distinctly that Balzac was one of the four sets, and the total price was $30,000, $40,000 or $50,000; that she thought the bindings were described at the last of the letter; that something was said in the letter about the time of payment as being so much cash on delivery, and so much cash in so many days, something like thirty days, or perhaps sixty days; that after she wrote the letter as dictated by plaintiff in error, he took it and sat down at the writing desk, where he had a penholder in his hand; that

48        Appellate Courts of Illinois.

she did not see him sign the letter; that she commented to plaintiff in error with reference to the letter as, "Some money for books," and he replied that they were old and rare editions and were to be bought by a lady out in Evanston who had more money than she knew what to do with.

The evidence introduced on behalf of the defendants bearing upon the pivotal question in the case, namely, whether or not plaintiff in error was a party to the alleged conspiracy to obtain money or property from Mrs. Patten by means of the Emerson order, and the false representations made to her by MacFarland, is embodied almost wholly in the testimony of plaintiff in error. He testified that he was thirty-six years of age, and had been a book agent for about twelve years; that he dealt only in very expensive de luxe and art editions of books; that in the spring of 1908, he had for sale Dickens in 130 volumes, at $1,000 per volume; St. Dunston in 12 volumes, at $1,500 per volume, and the works of Fielding, Smollet, DeFoe, Scott, Thackeray and Balzac at prices ranging from $100 to $150 per volume; that he owned some of said books, and sold others on a commission of 30 per cent. The testimony of plaintiff in error relative to his relations with MacFarland, the procuring of the contract from Mrs. Patten, the preparation and execution of the notes and the subsequent disposition of said contract and notes, is not materially variant from the testimony of MacFarland, except that plaintiff in error denied unequivocally that he proposed the scheme involving the use of the Emerson order, or dictated such order, or had any knowledge of its existence, or of its proposed use. He further testified that after the controversy arose regarding said contract and notes he was repeatedly assured by MacFarland that there was nothing wrong about the transaction; that it was honestly conducted, and that said contract and notes were procured by him, MacFarland, and executed by Mrs. Patten in

entire good faith in the usual course of legitimate business. The testimony of plaintiff in error was in direct conflict with that of Maxine Fay relative to the dictation by him of the Emerson order. He testified, however, that on or about April 29, 1908, he dictated to her, in the presence of MacFarland, an option addressed to "J. M. MacFarland, Annex Hotel," wherein he stated, in substance: "I have decided to extend to you an option on the following sets of books: Scott, Dickens, Balzac and Thackeray for five days, upon time contracts, payable within fifteen months, and if sale is made on a cash basis a discount of 10 per cent. will be allowed"; that the prices stated in the option were as follows: Dickens, $6,000; Thackeray, $5,200; Scott, $5,100, and Balzac, $6,000; and that he signed the option, "S. T. Warfield," and gave it to MacFarland. Plaintiff in error specifically denied all the statements attributed to him by the witnesses, Joseph E. Paden, James A. Patten, John T. Pratt, Maxine Fay, Ella McClelland and John M. MacFarland, which tended to show that he was a party to or had any knowledge of the alleged conspiracy.

Upon the issues of fact involved we are persuaded, after a most painstaking examination and consideration of the evidence, that the verdict of the jury, approved by the trial judge, should not be set aside as being unwarranted.

As to the form of their verdict, if they should find the defendants or either of them guilty, the jury were directed, in the alternative, to fix the punishment at imprisonment in the penitentiary for a term not exceeding five years and a fine not exceeding $2,000, or at imprisonment in the penitentiary alone, for such term, or at a fine alone, not exceeding $2,000. As before stated, the jury by their verdict found plaintiff in error guilty, and fixed his punishment at imprisonment in the penitentiary for the term of three years and at a fine of $2,000.

Following the case of People v. Murphy, 185 Ill. 623, wherein it was held that a person convicted of a misdemeanor (conspiracy) whose punishment was fixed by the jury at imprisonment in the penitentiary was amenable to be sentenced under the Parole law, the trial court, as before stated, disregarded so much of the verdict as fixed the term of imprisonment of plaintiff in error at three years in the penitentiary and sentenced plaintiff in error to imprisonment in the penitentiary under the Parole law and to pay a fine of $2,000, and costs of prosecution.

In People v. Hartsig, 249 Ill. 348, it was definitely held that a person convicted under section 46 of the Criminal Code of the crime of conspiring to obtain the money or property of another by false pretenses could not be sentenced under the Parole law, as the minimum term of imprisonment under that law could not be less than one year, whereas the punishment for the crime of conspiracy as fixed by said section 46 might be imprisonment in the penitentiary for a less term than one year. It is apparent, therefore, that the instruction to the jury as to the form of their verdict was in accordance with the law, and that the jury were authorized to fix the term of imprisonment of plaintiff in error in the penitentiary. It is also apparent that the trial court, acting under a misapprehension, improperly ignored so much of the verdict of the jury as fixed the punishment of plaintiff in error at imprisonment in the penitentiary for the term of three years and improperly sentenced plaintiff in error to imprisonment in the penitentiary under the Parole law. The judgment of the court being unauthorized, must be reversed, but as the verdict of the jury was legal and no reversible error intervened prior to the judgment, the case need not be remanded for a new trial, but should be remanded for resentence only. People v. Coleman, 251 Ill. 497.

For the error in sentencing plaintiff in error to the

penitentiary for an indeterminate period instead of the period of three years fixed by the jury, the judgment is reversed and the cause remanded to the Criminal Court of Cook county with leave to the state's attorney of that county to move for a proper judgment upon the verdict, sentencing plaintiff in error to imprisonment in the penitentiary at Joliet for the term of three years and to pay a fine of $2,000, and with directions to said court to enter such sentence.

*Reversed and remanded with directions.*